RECORD NO. 18-4123

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM R. WHYTE,

*Defendant-Appellant,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT DANVILLE

## OPENING BRIEF OF APPELLANT
## WILLIAM R. WHYTE

Justin M. Lugar
GENTRY LOCKE
P. O. Box 40013
Roanoke, VA 24022-0013
(540) 983-9300
jlugar@gentrylocke.com

*Counsel for Appellant*

**LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477**
**A Division of Lantagne Duplicating Services**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................3

STATEMENT OF THE CASE..............................................................4

STATEMENT OF FACTS ....................................................................5

    I.    Armet Contracts with the Joint Contracting Command in Iraq ................5

        A.   The JCCI Was Part of a Multi-National Coalition Tasked with Procuring Goods and Administering Contracts for the Multi-National Strategic Command in Iraq ("MNSTC-I")...............5

        B.   The Terms of the Contracts Between Armet and the JCCI...............8

    II.   The United States Indicts Whyte and Armet on July 19, 2012.................9

    III.  The Qui Tam Action.................................................................10

    IV.  Criminal Proceedings Against Whyte .......................................11

SUMMARY OF ARGUMENT ............................................................14

ARGUMENT ..................................................................................16

    I.    The Doctrine of Collateral Estoppel Barred the Indictment and the Government's Prosecution of Whyte  ......................................16

        A.  Standard of Review .......................................................16

        B.  The Elements of Collateral Estoppel...............................17

        C.  The First Four Fiel Factors Are Not In Dispute ..............17

i

D.  The District Court Applied the Wrong Legal Standard in Deciding the Fifth Fiel Factor .........................................................19

E.  The Government Was A Party With a Full and Fair Opportunity to Litigate ...................................................................20

F.  Congress Did Not Exempt the FCA from the Doctrine of Collateral Estoppel .........................................................................23

G.  The District Court's Opinion Undermines the Purposes of the FCA ........................................................................................28

H.  The District Court's Ruling Creates a Blanket Rule Previously Rejected by the Supreme Court.......................................................32

II.   The District Court Erred by Denying Whyte's Motion to Dismiss the Indictment Because it Was Legally Flawed and the Evidence Presented to Establish that the United States Was Defrauded Was Insufficient to Support the Jury's Verdict .................................................35

A.  Standard of Review .........................................................................35

B.  The Indictment Was Flawed as a Matter of Law And Should Have Been Dismissed Before Trial .................................................35

C.  The United States Code and Government Publications Confirm the Legal Status of the JCCI, MNSTC-I, and MNF-I as International Entities, Not the United States or an Agency/Department Thereof ..........................................................38

D.  The Government's Witnesses Confirmed that the JCCI, MNSTC-I, and MNF-I Were Not the United States or any Agency/Department Thereof.........................................................40

E.  The Evidence Erroneously Submitted to the Jury Was Independently Insufficient to Sustain a Conviction ........................42

III.    The Prosecution's Repeated Improper Comments to the Jury
        Warrant Reversal .................................................................44

        A.  Standard of Review ......................................................44

        B.  The Government's Persistent Comments to the Jury Deprived
            Whyte of a Fair Trial ...................................................44

CONCLUSION ......................................................................51

REQUEST FOR ORAL ARGUMENT ................................................53

CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)(2)(B)(i)
AND LOCAL RULE 32(b) .........................................................54

CERTIFICATE OF SERVICE .......................................................55

# TABLE OF AUTHORITIES

## CASES

*Ashe v. Swenson*,
　　397 U.S. 436 (1970)......................................................................17

*Barnhart v. Sigmon Coal Co.*,
　　534 U.S. 438 (2002)......................................................................24

*Carella v. California*,
　　491 U.S. 263 (1989)......................................................................45

*Devlin v. Scardelletti*,
　　536 U.S. 1 (2002)..........................................................................34

*Estelle v. Williams*,
　　425 U.S. 501 (1976)......................................................................44

*Greer v. Miller*,
　　483 U.S. 756 (1987)......................................................................45

*Keane v. United States*,
　　272 F. 577 (4th Cir. 1921) ...........................................................37

*Sandstrom v. Montana*,
　　442 U.S. 510 (1979)......................................................................45

*Standard Oil Co. of California v. Johnson*,
　　316 U.S. 481 (1942)......................................................................38

*Taylor v. Sturgell*,
　　553 U.S. 880 (2008).................................................................20, 32

*United States v. Brethauer*,
　　214 F. Supp. 820 (W.D. Mo. 1963) .............................................37

*United States v. Brooks*,
　　111 F.3d 365 (4th Cir. 1997) .......................................................36

iv

*United States ex rel. Bunk v. Gosselin World Wide Moving, N.V*,
    741 F.3d 390 (4th Cir. 2013) ....................................................21, 22

*United States ex rel. Eisenstein v. City of New York*,
    556 U.S. 928 (2009)...............................................24, 28, 32, 33, 34

*United States v. Ellis*,
    121 F.3d 908 (4th Cir. 1997) ..........................................................44

*United States v. Fiel*,
    35 F.3d 997 (4th Cir. 1994) .............................................12, 16, 17

*United States v. Gillion*,
    704 F.3d 284 (4th Cir. 2012) ..........................................................43

*United States v. Higgs*,
    353 F.3d 281 (4th Cir. 2003) ..........................................................45

*United States ex rel. Michaels v. Agape Senior Community, Inc.*,
    2015 U.S. Dist. LEXIS 82379 (D.S.C. June 25, 2015) ...................31

*United States ex rel. Milam v. University of Texas M.D. Anderson
Cancer Center*,
    961 F.2d 46 (4th Cir. 1992) ............................................................21

*United States v. Mitchell*,
    1 F.3d 235 (4th Cir. 1993) .............................................................45

*United States v. Ollivierre*,
    378 F.3d 412 (4th Cir. 2004) ..........................................................48

*United States v. Palomino-Coronado*,
    805 F.3d 127 (4th Cir. 2015) ....................................................35, 43

*United States v. Perry*,
    757 F.3d 166 (4th Cir. 2014) ..........................................................35

*United States v. Ruhbayan*,
    325 F.3d 197 (4th Cir. 2003) ....................................................16, 17

*United States v. Ward*,
 171 F.3d 188 (4th Cir. 1999) .........................................................17

*United States v. Washington*,
 398 F.3d 306 (4th Cir. 2005) .........................................................44

*United States v. Woolfolk*,
 399 F.3d 590 (4th Cir. 2005) .........................................................35

*Va. Hospital Associate v. Baliles*,
 830 F.2d 1308 (4th Cir. 1987) .......................................................19

*Vt. Agency of Natural Resources v. United States ex rel. Stevens*,
 529 U.S. 765 (2000).......................................................................21

## STATUTES & RULES

18 U.S.C. § 5 ....................................................................................38
18 U.S.C. § 6 ..............................................................................38, 39
18 U.S.C. § 287 ......................................................................*Passim*
18 U.S.C. § 1031 ....................................................................*Passim*
18 U.S.C. § 1343 .......................................................4, 9, 15, 16, 42
18 U.S.C. § 3231 ..............................................................................3
28 U.S.C. § 1291 ..............................................................................3
28 U.S.C. § 2701 ............................................................................33
31 U.S.C. § 3729 *et seq*....................................................................2
31 U.S.C. § 3729(b)(1)...................................................................22
31 U.S.C. § 3730(a) ......................................................................10
31 U.S.C. § 3730(b)(1)...................................................................30
31 U.S.C. § 3730(b)(5)...................................................................30
31 U.S.C. § 3730(c)(1)....................................................................32
31 U.S.C. § 3730(c)(2)(A)..............................................................30
31 U.S.C. § 3730(c)(2)(B)..............................................................31
31 U.S.C. § 3730(c)(3)....................................................................31
31 U.S.C. § 3730(c)(5)....................................................................31
31 U.S.C. § 3730(e)(4)(A)..............................................................29
31 U.S.C. § 3731 ............................................................................23

S. Rep. No. 99-112, 10 (1985) .................................................................26, 27

S.Rep. No. 99-345, 31 (1986), *reprinted in*
    1986 U.S.C.C.A.N. 5266, 5296 ..................................................23

S.Rep. No. 99-345, 31-32 (1986), *reprinted in*
    1986 U.S.C.C.A.N. 5266, 5296-97 ..............................................24

S.REP. No. 99-345, 32 (1986), *reprinted in*
    1986 U.S.C.C.A.N. 5266, 5297 ..................................................23

S.Rep. No. 99-345, 27 (1986), *reprinted in*
    1986 U.S.C.C.A.N. 5266, 5292 ..................................................24

Fed. R. App. P. 4 ....................................................................................33
Fed. R. Civ. P. 24 ..................................................................................29
Fed. R. Civ. P. 41 ..................................................................................29
Fed. R. Crim. P. 11(f) ...........................................................................24
Fed. R. Crim. P. 29 .................................................................................4
Fed. R. Crim. P. 33 .................................................................................4
Fed. R. Evid 410(a)(2) ...........................................................................24

# INTRODUCTION

Appellant William R. Whyte ("Whyte") is a 73 year-old former Scots Guard, retired Toronto police officer, and former manufacturer and distributor of custom armored vehicles. Whyte, born in the United Kingdom, is a dual UK-Canadian citizen who has called Canada home for many decades. For over 30 years, Whyte's now defunct company, Armet Armored Vehicles, Inc. ("Armet"), modified stock vehicles with armor and developed, manufactured, and sold a variety of unique armored vehicles that he personally designed. Whyte previously maintained facilities in Canada, the United States, Malta, and Russia.

In 2006, Armet entered into a contract to manufacture 32 armored vehicles for use by coalition forces in Iraq. Armet's performance, led by U.S.-based President Frank Skinner, was plagued from the very start by delays and managerial incompetence. Shortly after the award of the contracts in 2006, Skinner became a paid confidential informant to the Federal Bureau of Investigation ("FBI") and later to the Defense Criminal Investigative Services ("DCIS"), claiming that Armet and Whyte purposefully under-armored the vehicles. When Skinner left the employ of Armet in early 2007, he was replaced by Rick John, who later became a paid confidential informant after being confronted by investigators with accusations upon delivery of vehicles in Iraq. Throughout 2007 and into 2008, John recruited another Armet employee, Usman Bashir, to work as a paid

1

confidential informant.  By 2008, Armet had delivered only seven vehicles and sought to cancel its remaining obligations under the contract.

Some five years later, in July 2012, the United States indicted Whyte and Armet.  Three months after the Indictment, Skinner filed a *qui tam* complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, alleging the same fraudulent scheme described in the Indictment.  While Whyte contested extradition to the United States, he defended Skinner's *qui tam* complaint from afar.  Despite Whyte invoking his Fifth Amendment rights, a jury in Danville, Virginia, determined that neither Whyte nor Armet committed fraud.

Though Whyte had once been cleared of fraud under a preponderance standard, he was nevertheless extradited to Virginia in 2016.  Whyte stood trial in the fall of 2017 and was convicted by a jury on October 9, 2017.

Three legal errors, however, require reversal of his conviction.  First, the doctrine of collateral estoppel barred the Indictment and prosecution of Whyte. Though the United States did not intervene in Skinner's *qui tam* action, it was a party with a full and fair opportunity to litigate the issues that the jury ultimately decided unanimously in Whyte's favor on the same alleged fraud.

Second, the district court erred by not dismissing the Indictment as legally flawed by making an erroneous legal determination that the United States was the

defrauded party. The district court then morphed the legal question of party status into a factual issue and erroneously submitted it to the jury. The evidence on the issue of party status was insufficient to support a conviction, also warranting reversal of Whyte's conviction.

Third, the government engaged in a pattern of misconduct, including making numerous improper comments before the jury regarding defense counsel and making prejudicial burden-shifting comments to the jury. This pattern of misconduct prejudicially affected Whyte's substantial rights and deprived him of a fair trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. This is an appeal from a final judgment entered on February 20, 2018. JA 2977-2984. Whyte timely noticed his appeal giving this Court jurisdiction under 28 U.S.C. § 1291. JA 2985-6.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the United States have a full and fair opportunity in the *qui tam* action to litigate the issue of Whyte's alleged fraud?

2. Should the United States have been collaterally estopped from prosecuting Whyte because a civil jury previously found under a lower standard of proof that Whyte did not engage in the same fraud alleged in the Indictment?

3. Did the district court err by finding that the United States or an agency thereof was the victim of fraud as pleaded and as required by 18 U.S.C. §§ 287, 1031, and 1343?

4. Was there insufficient evidence to support the jury's finding that the United States or an agency thereof was defrauded?

5. Did the prosecution engage in prosecutorial misconduct, prejudicing Whyte's rights to a fair trial?

## STATEMENT OF THE CASE

This appeal arises from a prosecution of Whyte for major fraud against the United States, wire fraud, and false claims fraud. The government indicted Whyte on July 19, 2012, in a twelve-count Indictment. The Indictment charged Whyte with major fraud under 18 U.S.C. § 1031 (Counts 1-3), wire fraud under 18 U.S.C. § 1343 (Counts 4-9), and false claims under 18 U.S.C. § 287 (Counts 10-12). During trial, the government dismissed counts 4, 5, and 9. Whyte was convicted of Counts 1-3, 6-8, and 10-12 on October 9, 2017.

Following trial, Whyte moved for acquittal under Federal Rule of Criminal Procedure 29 and for a new trial under Rule 33(a). The district court denied his

4

motions by memorandum opinion on January 23, 2018.  On February 20, 2018, Whyte was sentenced to 70 months' incarceration and ordered to pay $2,019,454.36 in restitution.  Whyte noted the instant appeal on February 23, 2018.

## STATEMENT OF FACTS

### I.    Armet Contracts with the Joint Contracting Command in Iraq

Armet manufactured and supplied custom armored vehicles to both commercial and governmental entities, and previously possessed manufacturing facilities in Largo, Florida, and Danville, Virginia.  JA 26.  Whyte was the owner and chief executive of Armet and also owned a related Canadian company known as Armet Armored Vehicles Canada, Inc. ("Armet Canada").  JA 26-39.  Frank Skinner, the relator in the FCA action, was the President of Armet and oversaw all Armet operations in the United States, first in Largo, Florida, and later in Danville, Virginia.  JA 58.

In the spring and summer of 2006, Armet was awarded two contracts with the JCCI to produce 32 armored vehicles for use by Iraqi Personal Security Details.  JA 27.  These contracts were known as the 0028 Contract and the 0047 Contract, and were valued at $4,779,693.36 and $1,593,231.10, respectively.  JA 27.

### A.    *The JCCI Was Part of a Multi-National Coalition Tasked with Procuring Goods and Administering Contracts for the Multi-National Strategic Command in Iraq ("MNSTC-I")*

Shortly after the fall of Iraq in 2003, the coalition forces undertook to

5

reconstruct the nation. By November 2004, the U.S. Central Command issued Fragmentary Order (FRAGO) 09-668, *Contracting and Organizational Changes*, which tasked the JCCI as "a major subordinate command (MSC) of the MNF-I" to consolidate and administer contracts for the MNF-I. *See* JA 412-5. The MNF-I, Multi-National Force-Iraq, was the official name for the coalition forces in Iraq, and its role was created and defined by United Nations Security Resolution 1546 (2004). *See* JA 416-431.

The MNF-I was comprised of 41 organizations and member states, including, *inter alia*, NATO, the United States, the United Kingdom, Italy, Norway, Japan and the Netherlands. JA 412-5. While various agencies/ departments of the United States were tasked by the MNF-I with administering contracts procured by the JCCI and paid for by MNF-I and MNSTC-I funds, neither the United States, nor any of its departments, were a contracting party or a party with payment obligations. The MNF-I and its subordinate commands, including MNSTC-I, possessed funds derived from a variety of sources that were commingled, including the United Nations, World Bank, Iraqi seizures, the Development Fund for Iraq, and a host of nations. *See* JA 432-456, 3034. The DOD Inspector General confirmed that "Treasury assigned the appropriation symbol 21 2092 to the ISFF, Army" and that after "[t]he Army received the funds appropriated for Iraq" it "provided them to the [MNSTC-I]." *See* JA 513. It was

6

MNSTC-I, not the DOD or any other U.S. agency, that "identified requirements for

Defense articles and services" such as the contracts at issue here.  JA 513.

The following chart provides the organizational structure of the MNF-I,

MNSTC-I and the JCCI:



JA 2989.  MNSTC-I was the ultimate customer and end-user for the armored

vehicles in this case.  JA 2987.  MNSTC-I, like the JCCI, was a master subordinate

command of the MNF-I.  JA 2987.  The JCCI's role was to provide contract

procurement and administration on behalf of MNSTC-I, for the benefit of

MNSTC-I and the international efforts to stabilize and reconstruct Iraq.  JA 2987.

**B.**     *The Terms of the Contracts Between Armet and the JCCI*

Pursuant to the terms of the 0028 Contract and the 0047 Contract, Armet was to armor each vehicle, known as "the Gurkha," with "a minimum of Central European Norm (EU) B7 protection" designed to defeat specified armor-piercing bullets of a certain caliber and at a certain distance, as well as blast protection that "shall withstand blasts underneath the vehicle from grenades, and/or blasts of whatever nature equivalent to the strength of two DM51 German ordnance."  JA 28.  The JCCI's solicitation for MNSTC-I also requested four run-flat tires and a spare.  JA 28.

The 0028 Contract required delivery of 24 vehicles by July 21, 2006, and the 0047 Contract expected delivery of 8 additional vehicles within 90 days of the award of the contract (June 18, 2006).  Armet shipped the first two vehicles to Iraq in mid-August 2006, followed by the third and fourth vehicles in mid-October 2006.  JA 28.  The JCCI accepted and paid for each of the four vehicles delivered in 2006 on behalf of MNSTC-I.  JA 29.

On November 1, 2006, Armet submitted a Request for Progress Payment to the JCCI in the amount of $1 million and received a progress payment of $824,531.00 on December 6, 2006.  JA 29.  Armet delivered the fifth and sixth vehicles to the JCCI in February and September 2007, both of which the JCCI paid

8

for and accepted for MNSTC-I.  JA 29.  Armet attempted delivery of the seventh
vehicle on January 1, 2008, which the JCCI rejected.  JA 29.

The JCCI issued a "Show Cause Notice" to Armet on February 11, 2008.
JA 29.  Armet sought to terminate or renegotiate the 0028 and 0047 Contracts with
the JCCI by letter dated March 9, 2008, after the JCCI and Armet had previously
agreed to several significant contract modifications, but the JCCI ultimately
terminated both contracts on March 24-26, 2008.  JA 29.

## II.    The United States Indicts Whyte and Armet on July 19, 2012

Over four years after the JCCI terminated Armet's contracts, and over six
years after the JCCI awarded Armet the 0028 and 0047 Contracts, the United
States indicted Armet and Whyte, charging that each knowingly delivered under-
armored vehicles without run-flat tires in order to enrich themselves.  JA 26-39.
The United States alleged that Whyte under-armored the vehicles "where the
defects would not readily be apparent."  JA 33.  None of the individuals that
participated in the procurement of materials, or those that constructed, inspected,
and delivered the vehicles were indicted. JA 26-39.

As noted above, Armet and Whyte were both indicted on three counts of
major fraud in violation of 18 U.S.C. § 1031, six counts of wire fraud in violation
of 18 U.S.C. § 1343, and three counts of false, fictitious, or fraudulent claims in

9

violation of 18 U.S.C. § 287.  JA 26-39.  Each of the allegations in the Indictment stem from conduct associated with the 0028 and 0047 Contracts.  JA 26-39.

### III.  The Qui Tam Action

Frank Skinner, Armet's former President, and the individual that secured, and was responsible for the performance of the 0028 and 0047 Contracts, filed a *qui tam* complaint on October 16, 2012.  JA 45.  In the civil complaint, Skinner, acting in the name of, and on behalf of, the United States, alleged numerous violations of the FCA (24 counts in total against each defendant – Whyte and Armet), including fraudulent inducement, false certifications, false records, conspiracy to violate the FCA, and implied false certification.  JA 58.

After undertaking its mandatory duty to investigate Skinner's claims under 31 U.S.C. § 3730(a), the United States declined to intervene in August 2013.  JA 72-3.  The United States affirmatively invoked its right under the FCA to veto any proposed dismissal, settlement, or other discontinuance of the action without its prior written consent, requested all pleadings and orders to be served upon it, and reserved its rights at a later date to order deposition transcripts and to intervene for good cause shown.  JA 72-3.

After a three-day trial in June 2015, the jury was presented with identical special interrogatories on its verdict form for both defendants, Armet and Whyte.

10

JA 60, 114-6.  Special interrogatory number five inquired:  "Do you find by a preponderance of the evidence that Defendant William R. Whyte knowingly presented, or caused to be presented, false or fraudulent claims for payment for Gurkha armored vehicles fabricated by Armet Armored Vehicles, Inc.?"  JA 60, 114-6.  Special interrogatory seven asked: "Do you find by a preponderance of the evidence that Defendant William R. Whyte knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid for Gurkha armored vehicles that Armet Armored Vehicles, Inc. fabricated?"  JA 60, 114-6.  The jury answered "No" to each of the special interrogatories, finding that neither Whyte nor Armet engaged in any fraud.  JA 60, 114-6.  Neither Skinner nor the United States appealed the jury's unanimous verdict.

## IV.    Criminal Proceedings Against Whyte

As noted above, after withdrawing his final appeal in Canada contesting extradition to the United States, Whyte was transferred to the United States on September 22, 2016.  JA 5.  Once under U.S. jurisdiction, Whyte filed his first motion to dismiss the Indictment on October 20, 2016.  JA 53-81.  Whyte contended that the charges in the Indictment were barred by the statute of limitations as well as the doctrine of collateral estoppel.

The district court heard arguments on Whyte's first motion to dismiss on December 1, 2016.  JA 8, 281-316.  At the hearing, the United States conceded that

11

"the False Claims Act is a unique statutory creature" and that "there's no doubt that the United States has a unique role as the real party in interest in False Claims Act suits…." JA 302. District Judge Kiser pointed out to the government that it "seems to me that to argue that the issues, certainly the issue as to fraud, are not the same in both cases is sort of fancy." JA 310. The United States conceded the point, stating "I take your point, Your Honor" and shifted the argument back to whether the United States was a party with a full and fair opportunity to litigate the issues. JA 310.

The district court denied Whyte's motion on the grounds that he could not establish that the United States had been a party with a full and fair opportunity to litigate, but found that Whyte had satisfied four of the five key factors under this Court's precedent in *United States v. Fiel*, 35 F.3d 997, 1006 (4th Cir. 1994). JA 387.

Whyte noted an interlocutory appeal to this Court on the sole basis that each of the five *Fiel* factors were satisfied, requiring application of the doctrine of collateral estoppel and dismissal of the Indictment before Whyte would be forced to endure a second trial on the same issues. This Court concluded that "the district court's order is not an appealable collateral order" but stated that "Whyte's collateral estoppel claim is a defense to criminal liability…." JA 395.

12

Prior to trial, Whyte filed a second motion to dismiss on the grounds that, even if Whyte engaged in the fraud alleged, the legal elements of the offenses charged required that the United States or an agency thereof be the victim of the fraud. JA 400-456. Since Armet contracted with the JCCI, a master subordinate command of the MNF-I, neither the United States, nor an agency thereof, was alleged to have been defrauded. JA 400-456.

The district court denied Whyte's motion, stating that "as I recall the evidence, there was sufficient evidence in the civil trial that this was out of Uncle Sam's pocket" but noted that "if the facts vary a little bit during the trial, I'll revisit it at the end of the trial." JA 633. At the close of the government's case-in-chief, Whyte made an oral Rule 29 motion stating that "it's a legal question of whether or not the contracts at issue here were with the United States or an agency thereof, or whether they were with some other body." JA 2111. The district court held that "my bottom line is whose ox is getting gored, and I think it's the United States' ox getting gored…." JA 2122.

At trial following Whyte's unsuccessful interlocutory appeal, the government presented eight former employees of the JCCI involved in the two contracts at issue; three former Armet employees, including two paid confidential informants; a ballistic expert, a blast expert, and Special Agent John Schoeneweis of the Defense Criminal Investigative Service. The government did not call

13

Armet's former President and *qui tam* relator Frank Skinner because it could not "sponsor" his testimony.  JA 2007-8.  William Whyte testified in his own defense for nearly two days.  JA 2138-2523.

During the nine-day trial, the government dismissed counts 4, 5, and 9.  JA 964, 2127.  At the conclusion of the trial, the jury found Whyte guilty of all remaining counts alleged in the Indictment.  JA 2698-2700.  Following trial, Whyte moved to set aside the verdict and for a new trial under Rules 29 and 33. JA 2701-2719.

## SUMMARY OF ARGUMENT

The district court committed reversible error in determining that the United States was not collaterally estopped from pursuing identical fraud charges against Whyte after a jury found by a preponderance standard that Whyte did not engage in fraud.  JA 56-81, 164-180.  In the *qui tam* action brought by Skinner, the United States had a full and fair opportunity to litigate the same ultimate factual issue posed in the Indictment:  whether Whyte or Armet committed fraud on the government in relation to the 0028 and 0047 Contracts.  After a three-day trial, a jury conclusively determined on 48 separate counts that neither Whyte nor Armet engaged in fraud.

14

Just as the United States benefits from any favorable verdict in a non-intervened *qui tam* action, so too should the United States bear the risk of an unfavorable verdict. The district court's ruling permitting Whyte to be tried a second time for the same alleged conduct immunizes the United States in FCA actions from the doctrine of collateral estoppel, something that Congress did not do and implicitly rejected when amending the FCA in 1986 and again in 2011. The result of the district court's error highlights the rationale for the doctrine of collateral estoppel: in this case, two juries have come to opposite conclusions on the same issues. The Indictment should have been dismissed and the United States should not have been awarded another bite at the apple.

Second, the district court erred by denying Whyte's second motion to dismiss by finding that the United States or an agency of the United States was defrauded under 18 U.S.C. §§ 287, 1031, and 1343. Neither the United States, nor one of its agencies, were defrauded in this case, and the district court committed reversible error in finding that the United States was the fraud victim in this case. Instead, even if a fraud did occur, such a fraud was committed against the subordinate commands of the MNF-I, a multi-national entity. The Indictment in this case requires, as essential elements of each crime alleged, that the United States or one of its agencies be defrauded. The United States cannot step into the shoes of MNSTC-I, the JCCI, the MNF-I, or any other international entity under

15

18 U.S.C. §§ 287, 1031, or 1343. The evidence before the court, both documentary and testimonial, confirms that the government could not satisfy the elements of the charges as a matter of law.

The district court then erred further by submitting the question of whether the United States was a defrauded party to the jury as a factual question. Though the question of party status is an inherently legal question, even if the district court properly submitted the issue to the jury, the evidence adduced at trial was insufficient to support a conviction.

Third, a persistent pattern of prosecutorial misconduct deprived Whyte of a fair trial. The government engaged in improper remarks about defense counsel and engaged in several burden-shifting arguments that affected Whyte's substantial rights.

**ARGUMENT**

I.    **The Doctrine of Collateral Estoppel Barred the Indictment and the Government's Prosecution of Whyte**

   A.    *Standard of Review*

The Fourth Circuit "review[s] de novo a district court's refusal to dismiss an indictment assertedly barred by collateral estoppel." *Ruhbayan*, 325 F.3d at 201 (citing *Fiel*, 35 F.3d at 1005). "Findings of fact made by a district court in

connection with such a ruling are reviewed for clear error." *Ruhbayan*, 325 F.3d at 201 (citing *United States v. Ward*, 171 F.3d 188, 193 (4th Cir. 1999)).

### B.     *The Elements of Collateral Estoppel*

The concept of collateral estoppel is straightforward:  "It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).  This Court set forth a five-factor test for analyzing the applicability of collateral estoppel in *Fiel*.  The *Fiel* factors are as follows:

(1)     whether the issue in question is identical to the previous issue,
(2)     whether the issue was actually determined in the prior adjudication,
(3)     whether the issue was necessarily decided in that proceeding,
(4)     whether the resulting judgment settling the issue was final and valid, and
(5)     whether the parties had a full and fair opportunity to litigate the issue in a prior proceeding.

Whyte satisfied each of these elements.

### C.     *The First Four Fiel Factors Are Not In Dispute*

First, the district court held, and the United States conceded, that the issue of fraud relating to the JCCI contracts in the civil and criminal cases were identical. The district court was right in stating, "[t]he very first thing the government is going to have to prove in the criminal case is what they had – really, what they had to prove in the civil case:  That false claims were submitted.  If that didn't happen,

17

*the case goes away*." JA 309. (emphasis added). The government responded, "Yes, Your Honor, we have to prove certainly—." JA 309. The government attempted to argue that the essential elements of FCA claims were different from the essential elements of a criminal fraud charge such as wire fraud, but the district court found the government's argument irrelevant to the doctrine of collateral estoppel. JA 309-310. The district court found: "[i]t can't be wire fraud unless the claims were false." JA 310.

Judge Kiser explained that "to argue that the issues, certainly the issue as to fraud, are not the same in both cases is sort of fancy." JA 310. The government's concession on this point and the district court's holding indicate that Whyte satisfies the first *Fiel* element.

The government never mounted any serious response to the second, third, and fourth *Fiel* elements, and the district court implicitly found that each of these elements were satisfied, by focusing only on the first and fifth elements at the hearing and by only analyzing the fifth element in its opinion. JA 281-316, 380-392.

The second element, whether the issue was actually determined in the first proceeding, as well as the third element, whether the issue was necessarily decided in the first proceeding, is clear from the record. JA 56-81, 114-6. The civil jury's

18

verdict form and answers to the special interrogatories confirm that the jury actually determined the issue of fraud and falsity.  *See* JA 60, 114-6.

Regarding the fourth element, the government did not even mention that the civil jury verdict was not final and valid.  JA 138-163, 281-316.  There is no question that the civil jury's verdict was a final and valid judgment settling the issue of fraud or falsity in relation to the JCCI contracts.  Neither Skinner nor the government appealed the jury's verdict.  The fourth element of *Fiel* was satisfied.

The fifth, and final *Fiel* element, whether the parties had a full and fair opportunity to litigate the issues in the prior proceedings, formed the basis for the district court's erroneous denial of Whyte's motion.

## D.    *The District Court Applied the Wrong Legal Standard in Deciding the Fifth Fiel Factor*

The district court failed to apply the correct standard and analysis for determining whether the government should be deemed a party for purposes of collateral estoppel.  Instead, the district court read into the statutory scheme an exemption that does not exist.  In its opinion, the district court relied upon a bankruptcy case from the District of Maryland that, in turn, quoted a 1987 decision by this Court in *Va. Hosp. Assoc. v. Baliles*, 830 F.2d 1308 (4th Cir. 1987).  By doing so, the court only analyzed whether the government participated in and controlled the litigation, rather than considering the appropriate analytical

19

framework outlined by the Supreme Court some 21 years later in *Taylor v. Sturgell*, 553 U.S. 880 (2008). The district court also ignored the stated intent of Congress in substantively amending the FCA in 1986, 2009, and 2011.

**E.      *The Government Was a Party With a Full and Fair Opportunity to Litigate***

The general rule that non-parties are not ordinarily bound to a judgment has legally recognized exceptions to prevent inequities and to promote fairness in our judicial system. In *Sturgell*, the Supreme Court outlined at least six general situations that may exempt a non-party from the general rule that only parties to an action may be bound. *Sturgell*, 553 U.S. at 893-95. The applicable exemptions include: where a party and a non-party engage in an implied or express agreement that the non-party will be bound by the judgment, where there exists a pre-existing "substantive legal relationship" between the party and non-party such as assignor/assignee,[1] where one party essentially represents the rights of another non-party because the interests of the two are aligned, or where a special statutory scheme applies. *Id.*

---

[1] "Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Sturgell*, 553 U.S. at 894.

Each of these exemptions apply here. Though the government did not intervene and lead the FCA case at trial, it should be bound by the jury's findings that Whyte did not engage in fraud. It is uncontested that the government is the real party-in-interest in every FCA case, that it is awarded the lion's share of any recovery, that a "relator is essentially a self-appointed private attorney general" tasked with obtaining relief from damages suffered by the government, and that the relator's share is "analogous to a lawyer's contingent fee." *United States ex rel. Milam v. University of Texas M.D. Anderson Cancer Center*, 961 F.2d 46, 49 (4th Cir. 1992).

This Court, as well as the Supreme Court, has compared the relationship of the relator and the United States under the FCA to that of assignor/assignee. *See, e.g., United States ex rel. Bunk v. Gosselin World Wide Moving, N.V,*, 741 F.3d 390 (4th Cir. 2013); *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000). For example, in addressing a challenge to standing of the relator, Justice Scalia stated that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Vt. Agency*, 529 U.S. at 773. This Court described the relationship between the United States and a relator under the FCA as "the fundamental legal relationship among [the relator] as plaintiff and assignee, Gosselin as defendant and tortfeasor, and the government as victim and assignor." *Bunk*, 741 F.3d at 403.

21

This Court has also described the unique relationship between the government and relator as an integrated relationship: "[t]o deny a relator its bounty on the ground that it cannot pursue penalties alone would be to deny the United States due recompense, or, in the alternative, to deprive the government of its choice to forgo intervention." *Bunk*, 741 F.3d at 404. Accordingly, this Court has declined "to interpret the FCA in a manner that disrupts the statute's careful design … regardless of [whether the relator or the government] directs the litigation." *Id.*

There is no dispute that the FCA precludes any private citizen from bringing an FCA case for his or her own benefit; rather, the FCA prescribes that a case must be brought "for the United States Government" and "in the name of the Government." 31 U.S.C. § 3729(b)(1); JA 170, 385. The district court ignored the legal structure that the FCA creates: (1) an implicit agreement between a relator and the government upon commencement of an action, (2) that a relator and the government possess a substantive relationship upon declination (e.g., a relationship of assignor/assignee), and (3) that the relator always represents the rights of the government, and no other interests.

The FCA, as this Court and the Supreme Court recognize, creates a special statutory scheme that substantively defines the relationship between the United States and a relator. Despite the numerous unique aspects of the relationship between a relator and the government under the FCA, the district court

22

nevertheless ignored that relationship and the many compelling reasons that support treating the government as a party for collateral estoppel purposes in this case.

### F.  *Congress Did Not Exempt the FCA from the Doctrine of Collateral Estoppel*

The district court's approach was wrong, and there exists no legal, factual, or practical basis upon which to exclude FCA cases from the doctrine of collateral estoppel where the government does not intervene.  Nothing in the FCA exempts the government or the statutory scheme from the application of collateral estoppel. Where Congress intended to exempt the FCA from an established common law doctrine, it expressly did so.  For example, the 1986 amendments to the FCA introduced subsection (d) to 31 U.S.C. § 3731 (now found in subsection (e)), "providing that a nolo contendere plea in a criminal fraud case shall have collateral estoppel effect in a subsequent civil fraud action."  S.REP. NO. 99-345, 31 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5296.  The Senate Committee reasoned that "given the high priority which should be afforded to the effective prosecution of procurement fraud cases, an exception to this general rule should be made for False Claims Act cases."  S.REP. NO. 99-345, 32 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5297.

23

Congress, therefore, was deliberate when it exempted the FCA from a well-established common law doctrine that is also recognized as a default rule by FRE 410(a)(2) and FRCrP 11(f). S.REP. NO. 99-345, 31-32 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5296-97. The Supreme Court has been clear that "when Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 935 (2009) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)). The presence of language exempting the FCA from a default common law rule becomes particularly important where, as is the case here, the district court reads into the statute an exemption to the common law doctrine of collateral estoppel. Congress did no such thing.

Congress explained its decision to clarify the meaning of subsection (c)(3) of §3730, noting that the government may elect to pursue an administrative remedy in lieu of a judicial proceeding after intervention. S.REP. NO. 99-345, 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292. The Senate Committee stated:

> While the Government will have the opportunity to elect its remedy, it will not have an opportunity for dual recovery on the same claim or claims. In other words, the Government must elect to pursue the false claims action either judicially or administratively and ***if the Government declines to intervene in a qui tam action, it is estopped***

24

*from pursuing the same action administratively or in a separate judicial action*.

*Id*. (emphasis added).

The quote above leads to several conclusions. First, where the government intervenes in a *qui tam* action, as opposed to initiating its own FCA action, it must decide whether to pursue the claim judicially or administratively. It cannot litigate the case on multiple civil fronts. Second, where a relator files a *qui tam* action, and the government declines to intervene, Congress provided that the government is estopped from pursuing the same action administratively or in a "separate judicial action." S.REP. NO. 99-345, 27 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5292.

The Committee's statement regarding subsection (c)(3) means that Congress considered and rejected the notion that the government should be able to rely on the relator to pursue a *qui tam* claim while the government pursues a parallel administrative action or another parallel "separate judicial action" resulting in two chances at a recovery. The rationale behind the 1986 amendments to alternative remedies was based on common law notions that no party or real party-in-interest should be able take two bites of the apple and potentially receive a windfall.

The district court's ruling, however, permits the government to have two bites of the apple. The government can decline intervention, observe the

25

development of the evidence, and collect on a favorable judgment if obtained by the relator.  Indeed, in this case, Skinner confirmed by letter to the government after trial that "the Govt determined: … They wanted to use the evidence provided by Whyte's defense in the criminal case."  JA 2762.[2]  But, under the district court's ruling, if the relator fails to succeed, such as is the case here, then the government would nevertheless be permitted to file an identical complaint and pursue the case a second time.  Congress rejected such an application of the FCA.

This reading squares with the Department of Justice's ("DOJ") submissions to the Senate Committee on the eve of enactment of the 1986 amendments.  In its statement to the Committee, the DOJ specifically requested that no amendments be enacted that would deny the evidentiary value of any finding of civil liability under the FCA in any "administrative, civil or criminal proceeding."  S. REP. NO. 99-112, 10 (1985).  Associate Attorney General Richard K. Willard stated,

> we believe that there is ***no justification for disturbing the normal rules of res judicata and collateral estoppel***, and requiring another tribunal to go through the costly exercise of retrying the same facts that have already been established under the same standard of proof in a civil penalty proceeding.

*Id.* (emphasis added).

---

[2] *See also* JA 797 ("[T]he government, in the course of [the *qui tam*] trial, on emails back and forth on June 2nd [2015], while trial was going on, Mr. Skinner was communicating with the government agent, who was offering not only encouragement in the trial, but also apparently providing documents to Mr. Skinner to be used at trial.").

26

Rather than exempt the FCA from the doctrine of collateral estoppel, the DOJ requested that a proceeding following an FCA case, including a criminal proceeding such as is the case here, be subject to "the normal rules of … collateral estoppel." S. REP. NO. 99-112, 10 (1985). And this makes perfect sense: there is no good reason to exempt the statutory scheme from the common law rules of collateral estoppel and to retry the same facts that did not support a factual finding of fraud or falsity under a lesser burden of proof.

What the legislative history of the 1986 amendments reveals is that Congress explored, debated, and ultimately made considered, careful decisions about the effect of a judgment rendered at the conclusion of an FCA case, regardless of whether the relator or the government leads the litigation. The FCA's deliberate silence on the application of collateral estoppel to a final judgment, positive or negative for the United States and the relator, was just that: deliberate. When Congress detoured from common law rules in the FCA, it did so explicitly, and it did not exempt FCA claims from the doctrine of collateral estoppel regardless of whether the United States intervenes or assigns litigation strategy to a relator. The district court's opinion reads into the FCA an exemption from the doctrine of collateral estoppel that Congress rejected. Therefore, the basic premise upon which the district court ruled is faulty and the government can, and should, be

treated as a party for purposes of collateral estoppel even where it does not intervene in a *qui tam* action.

**G.**      ***The District Court's Opinion Undermines the Purposes of the FCA***

Furthermore, the government disclaims its party status because it does not like the result of the civil jury verdict, but claims its party status when beneficial. The FCA does not permit such disregard of the doctrine of collateral estoppel because the government opted to assign enforcement of its rights to a relator. In ruling for the government here, the district court announced a blanket rule that fundamentally clashes with the language and purpose of the FCA, as well as the Supreme Court's ruling in *Eisenstein*. The district court's claim that "there would be no purpose to Congress's decision to permit the government to elect to intervene, or to decline to intervene" because the government would be "forced to be a party regardless of its intervention decision" illustrates another fundamental flaw in the district court's analysis. JA 385.

Declination does not represent an automatic, permanent withdrawal of the government as a party that will not have a full and fair opportunity to litigate the relator's claims or to litigate certain factual assertions or findings. Instead, if the district court's blanket rule were upheld, it would render the FCA's intervention proceedings meaningless and superfluous to intervention rights already provided

for under Federal Rule of Civil Procedure 24, and would actually "eviscerate the government's election option." JA 386.

Under the FCA, the government retains unique, substantive powers the district court overlooked and which typical non-parties with intervention options under Federal Rule of Civil Procedure 24 do not possess. These powers support affixing party status to the government in certain circumstances, in part because these powers provide the government with additional opportunities to fully and fairly litigate a case under the FCA.

For example, as part of the 2011 Affordable Care Act amendments to the FCA, Congress gave the government the exclusive right to veto dismissal of an FCA claim based on the public disclosure bar even where it has not intervened. 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section, ***unless opposed by the Government***, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed….") (emphasis added). JA 169. The district court overlooked this important, exclusive right of the government that is a right indicative of party status.

A relator is not permitted to voluntarily dismiss a complaint, because only the government retains this right. Despite Rule 41 of the Federal Rules of Civil Procedure, which is available to all other litigants, a relator cannot dismiss the

29

action without the consent of the United States and the district court.  *See* 31 U.S.C. § 3730(b)(1) ("The action may be dismissed ***only if the court and the Attorney General give written consent*** to the dismissal and their reasons for consenting.") (emphasis added).  As noted above, where the FCA carves an exception to a general rule, such as those general rules embodied in the Federal Rules of Civil Procedure or Federal Rules of Evidence, Congress explicitly stated so.

The district court opined that treating the government as a party for collateral estoppel purposes in the present case amounts to the "Defendant deputiz[ing] [relators] as private United States Attorneys."  JA 386.  First, no defendant in any FCA or criminal case makes any decisions about whether or not the government intervenes and leads litigation or assigns the conduct of the civil litigation to the relator.  Second, it is the government that makes a choice and it is the government that solely retains certain important choices even after its initial intervention decision.  *See, e.g.,* 31 U.S.C. § 3730(b)(5) ("no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."); 31 U.S.C. § 3730(c)(2)(A) ("The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.");

30

31 U.S.C. § 3730(c)(2)(B) ("The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances."); 31 U.S.C. § 3730(c)(3) ("the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause."); 31 U.S.C. 3730(c)(5) ("Notwithstanding subsection (b), the Government may elect to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding to determine a civil money penalty."); *United States ex rel. Michaels v. Agape Senior Community, Inc.*, 2015 U.S. Dist. LEXIS 82379 (D.S.C. June 25, 2015) (confirming that the Government's consent is required for the voluntary dismissal of claims where the government declined to intervene).

Here, the government monitored discovery, received copies of pleadings and depositions, and could have availed itself of numerous opportunities to seek dismissal of the relator's complaint and avoid the effects of an adverse jury verdict. The government knew that the FCA action would be tried before Whyte would be tried criminally, yet the government decided to permit Skinner to lead the litigation on its behalf because the government "wanted to use the evidence provided by Whyte's defense in the criminal case." JA 2762.

The FCA is clear that when the government intervenes, the government "shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). When the government does not intervene and assigns the conduct of the litigation to the relator, it must be bound by the acts of the relator for purposes of collateral estoppel. If the government were not bound by the acts of a relator in a *qui tam* action, it could initiate an identical direct (non-*qui tam*) FCA complaint, forcing the defendant and the court to re-try an identical case with a different jury that might result in conflicting verdicts. Such a result is precisely what the doctrine of collateral estoppel precludes. As the Supreme Court has stated, the purpose of the doctrine of collateral estoppel is to "protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Sturgell*, 553 U.S. at 892.

**H.**     ***The District Court's Ruling Creates a Blanket Rule Previously Rejected by the Supreme Court***

The government's argument that it cannot be a party that had a full and fair opportunity in non-intervened FCA cases seeks to create a blanket rule exempting only the government from the doctrine of collateral estoppel in FCA matters. JA 164-180, 284, 287, 314. The district court here created just such a blanket rule that Justice Thomas expressly declined to adopt in *Eisenstein*, 556 U.S. 928 (2009), and

32

which then Solicitor General Elena Kagan urged the Court not to do. *See Eisenstein*, 556 U.S. at 937; JA 164-7.

Justice Thomas' opinion in *Eisenstein* never considered the possibility that such a rule would be applied in every FCA case or even beyond the limited scope of the Court's analysis under Federal Rule of Appellate Procedure 4 and 28 U.S.C. § 2701. For example, Justice Thomas was careful to describe the limitations of the Court's analysis and holding to determining "the United States' party status ***for purposes of Rule 4(a)(1)(B)* …** [or] ***§ 2107***" only. *Eisenstein*, 556 U.S. at 936-7.

Justice Thomas noted that the fact that the government is bound by the judgment in an FCA case regardless of its intervention decision is not "determinative" for analysis of procedural timing for appeals. *Eisenstein*, 556 U.S. at 936. Therefore, determining "the United States' party status" for other purposes, such as collateral estoppel, cannot be subject to the analysis and application considered solely for purposes of appellate rights.

Instead, the Supreme Court adopted Solicitor General Kagan's position that the Court "should not announce a categorical rule that intervention is the only means by which the government can become a party to such a case." JA 166. Kagan continued, stating that "this Court need not decide what types of participation by the government in a declined *qui tam* action might warrant

33

treatment as a party." *Id.* (quoting Brief for the United States as Amicus Curiae Supporting Respondents in *Eisenstein*).

Justice Thomas' opinion in *Eisenstein* comports with common sense and the position of the government in *Eisenstein*: determination of party status in a *qui tam* action should not be fixed in non-intervened cases. Prior Supreme Court decisions, such as that in *Sturgell*, hold that party status for collateral estoppel purposes requires an analysis that takes into account the underlying purpose for the doctrine: to prevent the re-litigation of issues that have already been litigated.

The narrow holding in *Eisenstein*, that "when the United States has declined to intervene in a privately initiated FCA action, it is not a 'party' to the litigation *for purposes of either § 2107 or Federal Rule of Appellate Procedure 4*[,]" recognizes Congress' careful consideration of these issues in amending the FCA. *Eisenstein*, 556 U.S. at 937 (emphasis added). The district court misapplied the narrow holding in *Eisenstein*, and has now created an exception in the FCA that Congress rejected.

In so doing, the government and the district court fail to recognize that "the label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on the context." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002) (discussing party status in

34

the context of non-named class members that seek to appeal a settlement of class claims). The government should not have been permitted to re-try Whyte for a fraud that a jury previously decided did not occur. The verdict should be set aside and the Indictment dismissed.

## II. The District Court Erred by Denying Whyte's Motion to Dismiss the Indictment Because it Was Legally Flawed and the Evidence Presented to Establish that the United States Was Defrauded Was Insufficient to Support the Jury's Verdict

### A. *Standard of Review*

"We review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusions de novo." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (quoting *United States v. Woolfolk*, 399 F.3d 590, 594 (4th Cir. 2005)).

"We review a challenge to the sufficiency of the evidence de novo." *United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015).

### B. *The Indictment Was Flawed as a Matter of Law and Should Have Been Dismissed Before Trial*

#### (1) Party Status is a Threshold Legal Question

The district court erred by failing to dismiss the Indictment against Whyte in its entirety because it was legally flawed on all counts. JA 2122. The Indictment charged major fraud against the United States in violation of 18 U.S.C. § 1031 in

Counts 1-3.  JA 32.  Counts 4-9 charged Whyte with wire fraud.  JA 34.[3]  Counts 10-12 charged Whyte with making false, fictitious, and fraudulent claims in violation of 18 U.S.C. § 287.  JA 36.

Prior to trial, Whyte moved the district court to dismiss the Indictment because the United States was not a party to the contracts with Armet, an essential element of each species of fraud pled.  *See United States v. Brooks*, 111 F.3d 365, 368-69 (4th Cir. 1997) (finding that to support a § 1031 charge, even if the defendant is not in "privity with the United States" the defendant must still be "involved with a prime contract with the United States").  Here, there was no prime contract with the United States and the issue of contracting party status should have been conclusively determined by the district court as a legal question.

During the pre-trial motions hearing, Whyte was clear that the government "got the wrong party here" and such a determination is a legal determination because "[y]ou can't go sue somebody in court civilly or press charges criminally against the wrong entity."  JA 631.  The district court denied Whyte's motion and incorrectly transformed a legal question into a quasi-factional question: "if the facts vary a little bit during the trial, I'll revisit it at the end of the trial."  JA 633.

Following the government's case-in-chief, Whyte moved for judgment of

---

[3] As noted above, upon the government's motion, the district court dismissed with prejudice counts 4, 5, and 9.

acquittal, stating that "it's a legal question of whether or not the contracts at issue here were with the United States or an agency thereof, or whether they were with some other body." JA 2111. Whyte continued, "there's only one conclusion, and it's a legal conclusion about who this contract was with, and it was with a multi-national body." JA 2111. Accordingly, the question of which entities were involved with these contracts was legal in nature and "the jury can't make a determination about that." JA 2122. Whyte renewed his motions at the close of all evidence in the case, as well as in post-trial motions. JA 2505-6, 2701-2719, 2746-2763, 2810-4. During the charging conference, Whyte again objected to submitting the issue of which entity contracted with Armet to the jury. JA 2509, 2518.

The law in the Fourth Circuit on the legal status of parties is clear: whether an entity forms part of the United States or an agency/department thereof is a legal question. *See Keane v. United States*, 272 F. 577, 578-79 (4th Cir. 1921) (treating the question of whether a post exchange was an institution of the United States as a "threshold" question and determining that "if [the post exchange] is not such an institution, then no dealing by the defendant Keane with such exchange could operate as or involve a fraud upon the United States…."); *see also United States v. Brethauer*, 214 F. Supp. 820 (W.D. Mo. 1963) ("Whether a post exchange is or is not 'within the jurisdiction of any department or agency of the United States' is

37

***dependent upon its legal status*** and its relationship to the United States and its established departments.") (emphasis added).[4]   The JCCI and MNSTC-I, which both answer to the MNF-I and only the MNF-I, are not departments or agencies of the United States and it was legal error to submit that question to the jury.

**C.**     ***The United States Code and Government Publications Confirm the Legal Status of the JCCI, MNSTC-I, and the MNF-I as International Entities, Not the United States or an Agency/Department Thereof***

Title 18 of the U.S. Code defines the terms "United States" and "Department and agency".  18 U.S.C. § 5 provides that "[t]he term 'United States', as used in this title in a territorial sense, includes all places and waters, continental or insular, subject to the jurisdiction of the United States, except the Canal Zone."  18 U.S.C. § 6 states that "[t]he term 'department' means one of the executive departments enumerated in section 1 of Title 5, unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government."    The term "agency" includes "any department, independent establishment, commission, administration, authority, board or bureau of the United States or any corporation in which the United States has a proprietary interest, unless the context shows that such term was intended to be used in a more

---

[4] While post exchanges were later determined to be an arm of the government of the United States in *Standard Oil Co. of California v. Johnson*, 316 U.S. 481 (1942), this Court's holding that the status of an entity/institution is a threshold legal question in the context of criminal allegations of defrauding the United States remains unchanged and instructive in this case.

limited sense." 18 U.S.C. § 6. The JCCI, MNSTC-I, and the MNF-I fall well outside the plain language of these definitions.

In this case, the contracts at issue were between the JCCI and Armet for the benefit of MNSTC-I. The JCCI administered the contracting process on behalf of MNSTC-I, which in turn, was a master subordinate command of the MNF-I, not the United States. While employees of various agencies/departments of the United States were seconded to the JCCI and tasked by the MNF-I with administering contracts procured by the JCCI and paid for by MNF-I funds, neither the United States, nor any of its departments or agencies, were a contracting party or a party with payment obligations.

Unchallenged objective evidence of the legal status of the JCCI, MNSTC-I, and the MNF-I established that the United States was not a party to the contracts at issue. The supposed victim in this case, the Department of Defense ("DOD"), confirmed in its own publication in 2009 that "funds appropriated for Afghanistan and Iraq [are] processed through the Foreign Military Sales trust fund" and "[t]he Army received the fund appropriations for Iraq and provided them for MNSTC-I." JA 3021-2, 1613-4.

Likewise, the MNF-I possessed its own funds from a variety of sources, including the United Nations, World Bank, Iraqi seizures, the Development Fund

39

for Iraq, and a host of nations; no claim was made upon or against the United States for these contracts; and 18 U.S.C. § 287 does not protect a multi-national body from false claims. *See* JA 454-6, 2989, 3034. Though a department of the United States was tasked to administer payment on behalf of the JCCI, the U.S. Army Corps of Engineers Finance Center ("USACE") acted just as a bank acts in facilitating the transfer of money between accounts. USACE, in turn, operated on orders of MNSTC-I and the JCCI to transfer MNSTC-I's funds to Armet. USACE, like the officers tasked to the JCCI's mission, simply facilitated payment of an international entity's money to Armet.

**D.** *The Government's Witnesses Confirmed that the JCCI, MNSTC-I, and the MNF-I Were Not the United States or any Agency/ Department Thereof*

Though it was error for the district court to morph the issue of legal status of the JCCI, MNSTC-I, and the MNF-I into a factual issue, the facts borne out at trial confirmed that the JCCI was a subordinate command of the MNF-I and procured goods with MNSTC-I's money for MNSTC-I's benefit. For example, on cross-examination, the government's first witness at trial, retired Lt. Col. Jeffrey Voss, testified as to the accuracy of the reporting structure for the MNF-I as outlined in DX-3 and provided above. JA 896-7. Air Force Master Sergeant Michael Hollon confirmed that the "funding request came not from the U.S. Army, not from the Air Force, not from the Navy … [i]t came from MNSTC-I." JA 996.

40

Navy Captain Thomas Neville, the most senior officer called by the government and the "team chief of the commodities cell" for the JCCI, described the JCCI's role as assisting with "the restitution and rebuilding of the Iraqi government and Iraqi economy" in "directly supporting MNSTC-I." JA 1096-7. Captain Neville confirmed (1) that MNSTC-I paid for the vehicles at issue; (2) that "the MNSTC-I was a master subordinate command of the Multi-National Forces in Iraq"; (3) that the "Multi-National Security Force Iraq" is "not the U.S." and instead "[i]t's multi-national"; and (4) that various countries across the world "gave equipment, resources, money" to the reconstruction efforts. JA 1165-6.

Though the government's own witnesses confirmed reporting lines and the subordinate relationship of the JCCI to MNSTC-I and ultimately the MNF-I, the government did all it could to rehabilitate its witnesses' testimony. For instance, though the most senior officer called as a witness, Capt. Neville, testified that MNSTC-I and the MNF-I were not the United States and that many different countries gave equipment, resources and money to the joint cause, on re-direct, he testified that he represented the United States government in relation to the contracts at issue, that the United States paid for the vehicles, and that U.S. military officials worked on the contract administration. JA 1202-3.

Capt. Neville may well have viewed his job as representing the United States, but his contradictory answer at trial illustrates exactly why the question of

41

legal status is a legal question for the district court and not for the jury. Capt. Neville, the most senior and most experienced witness to testify for the government, received his pay from the U.S. Navy, wore his Navy uniform, and worked surrounded by mostly American soldiers deployed to the JCCI. In answer to the government's questions on these issues, he legitimately believed that he was operating on behalf of the United States. But for purposes of this case, under charges pursuant to 18 U.S.C. §§ 287, 1031, and 1343, Capt. Neville, like all other U.S. servicemen and women seconded to the JCCI as part of a multi-national effort in Iraq, served at the behest of the MNF-I. The MNF-I, as described above, directed MNSTC-I and the JCCI to perform their missions in support of a UN-created multi-national force with funds, equipment, and personnel that were ultimately controlled and distributed by the MNF-I, not the United States, the United Kingdom, the UN, or any other nation or international entity. JA 2987, 2989, 3034.

### E.    *The Evidence Erroneously Submitted to the Jury Was Independently Insufficient to Sustain a Conviction*

Even if the district court did not commit reversible error by submitting the question of the legal status of the JCCI and MNSTC-I to the jury, the facts presented to the jury were insufficient to sustain a conviction. This Court has held that it "must affirm the verdict if it is supported by substantial evidence, viewed in

42

the light most favorable to the government." *See United States v. Gillion*, 704 F.3d 284, 294 (4th Cir. 2012). "Substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Palomino-Coronado*, 805 F.3d at 130.

Here, "the prosecution's failure is clear" because no reasonable finder of fact could have determined that the JCCI, MNSTC-I, or the MNF-I fit the definition of "the United States or an agency/department thereof." For all of the reasons stated above, there can be little doubt that the JCCI operated as a master subordinate command of the MNF-I and performed contract administration for the benefit of MNSTC-I. These entities were created and staffed by international agreement and resolution by the United Nations. *See* JA 432-456, 2989, 3021-2, 3034. These entities were created by operation of international agreement and answered to the MNF-I, not to the United States or any agency/department thereof. While Congress appropriated funds for these efforts, among others, the funds were transferred from the Treasury to the Army, then to MNSTC-I. MNSTC-I, in turn, requested the JCCI to procure goods and services and the USACE Finance Center transmitted payments at MNSTC-I's direction to Armet.

Though the question of party status of the contracts at issue in this case is legal, should the issue be deemed a fact issue, the evidence was not sufficient to

43

sustain the conviction as each count of the Indictment required a finding beyond a reasonable doubt that Whyte defrauded the United States or an agency/department thereof.

## III.   The Prosecution's Repeated Improper Comments to the Jury Warrant Reversal

### A.   *Standard of Review*

As to an allegation of prosecutorial misconduct, this Court reviews a district court's factual findings for clear error and its legal determinations de novo.  *United States v. Washington*, 398 F.3d 306, 310 (4th Cir. 2005); *United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997).

### B.   *The Government's Persistent Comments to the Jury Deprived Whyte of a Fair Trial*

The government engaged in improper conduct including burden-shifting statements made before the jury throughout trial and during closing argument. Such improper conduct and burden-shifting statements, especially when made on a recurring basis, were intended to influence the jury and deprive the defendant of a fair trial.

"[T]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."  *Estelle v. Williams*, 425 U.S. 501, 503 (1976).  The government carries the burden of proving each and every element of a criminal offense beyond a

44

reasonable doubt, and any conduct that shifts that burden to a defendant constitutes a violation of due process. *See Carella v. California*, 491 U.S. 263, 265 (1989); *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979).

Charges of prosecutorial misconduct are analyzed under the same framework regardless of whether they involve improper questioning or argument. *See, e.g.*, *Greer v. Miller*, 483 U.S. 756, 765-67, (1987). In order to obtain a new trial on the basis of prosecutorial misconduct, a defendant must demonstrate (1) that the government's remarks were in fact improper and (2) that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003) (*quoting United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993)). In evaluating prejudice, the Court considers factors such as "(1) the degree to which the prosecutor's remarks had a tendency to mislead the jury and to prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the defendant; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury." *Higgs*, 353 F.3d at 330. Likewise, "the issue

of whether improper argument by government counsel has so prejudiced the trial process as to require reversal must be gauged from the facts of each trial." *Id.*

The government engaged in a pattern of misconduct that misled the jury and prejudiced Whyte. For example, on cross-examination of Capt. Neville, counsel for Whyte asked whether Neville was aware that Frank Skinner (Armet's President and *qui tam* relator) at the time of their conversations in 2006 was acting as a confidential informant for the FBI. The government objected and stated in front of the jury that "there's been no testimony and he knows he is misleading when he's asking these questions." JA 1184. Counsel for Whyte responded that Skinner "has testified under oath in this courtroom, Your Honor, about that. I can show you." JA 1184. The government responded, in front of the jury, "now I object strongly and ask that we approach the bench, because you have made an order." JA 1185. The government knew that Skinner had testified in his deposition, before the grand jury, and in the FCA trial that he became an informant for the FBI in August/September of 2006. JA 1185-6. The district court overruled the objection after counsel for Whyte pointed to these instances of Skinner's consistent prior testimony on the fact. JA 1186. The government knew that Skinner had testified consistently in prior instances on this point, yet still prejudicially stated that counsel for Whyte was "misleading" the jury, not once, but twice.

46

In a similar vein, counsel for Whyte asked contracting officer Casey Walterscheid whether "anyone ever t[old] you the FBI was investigating details in these vehicles at this [March 2007] time?" JA 1671. Counsel for the government objected and injected the following comment: "Counsel knows that's an outright misrepresentation." JA 1671. The prosecutor continued, stating in front of the jury that counsel for Whyte "can't just make up lies in front of the jury and then pose it as some sort of a question." JA 1671. Walterscheid then testified that he was never told anything about any defects in the vehicles while he was administering the contracts at issue. JA 1672. As the trial progressed, the prosecution graduated from making comments to the jury that Whyte and his counsel were "misleading" the jury to calling counsel, and ostensibly Whyte, liars in front of the jury.

The prosecution's prejudicial behavior continued with the next government witness, contracting officer Ron Toler. On cross-examination, counsel for Whyte inquired as to whether Toler had considered information submitted by Armet's Canadian legal counsel in determining whether to continue with the contract at issue. JA 1706. The prosecutor objected and stated in front of the jury that "defense counsel makes these statements up and throws them at the witness…." JA 1707. The court overruled the objection, but did not admonish counsel for the government or provide any immediate curative instructions to the jury. JA 1707.

47

Finally, by the end of Toler's re-direct examination, the prosecution asked "Is [Whyte] blaming the United States for his inability to perform?"  JA 1725. Whyte's counsel objected and the district court stated, "[y]ou knew that was an improper question when you asked it Ms. Carlton."  JA 1725.

This Court has "emphasize[d] the importance of ensuring that prosecutors refrain from impugning, directly or through implication, the integrity or institutional role of their brothers and sisters at the bar who serve as defense lawyers."  *United States v. Ollivierre*, 378 F.3d 412, 420 (4th Cir. 2004). Resorting to "such backhanded tactics may well indicate a lack of sufficient evidence or a failed attempt to unearth admissible evidence."  *Id.*  Likewise "a prosecutor's disparaging comments about defense counsel may impermissibly strike at [the defendant's] due process right to present his case to the jury…."  *Id.*

Though it is "the prosecutor's duty … to refrain from improper methods calculated to produce a wrongful conviction," the improper, prejudicial comments and questions continued with the examination of paid confidential informant and former Armet employee, Usman Bashir.  On re-direct, AUSA Carlton asked whether Bashir was "also providing information about Mr. Whyte's other activities inside Russia…."  JA 1861.  Counsel for Whyte immediately objected stating that "[t]here's no 404(b) notice, and she knows darn well that's totally improper."  JA 1861.  Counsel further pointed out that "[s]he asked the questions and she gets out

48

the improper part." JA 1861. The district court sustained the objection, but did not offer any curative instructions. JA 1861-2.

In the ensuing days, the government continued its misconduct and began making prejudicial comments that shifted the burden to Whyte. The most glaring example of burden-shifting statements came from the government on October 3, 2017:

> MS. CARLTON: I object. Objection. Is Mr. Bondurant trying to talk about what Frank Skinner may have testified in some other case of which the United States wasn't a party? ***If he wants Frank Skinner, he can call Frank Skinner***. ***He's talked to him. He can call him to the stand***.

JA 2043. AUSA Carlton made these statements in the presence of the jury, indicating that the defense could call potential witness Skinner and produce this evidence. The prosecution further stated that defense counsel had spoken to Skinner and implied that defense counsel had the opportunity to interview Skinner and discuss his testimony. These statements, while misleading and factually inaccurate, were also highly improper and intended to mislead the jury to believe that the defense had equal access to the witness and implied that the defendant had the burden of producing witnesses and evidence in his defense.

Based on these improper prejudicial statements before the jury, the defense was forced to make an oral motion for the declaration of a mistrial on October 3, 2017. JA 2127, 2045-9. The district court denied this motion but agreed to

49

include a curative instruction regarding burden of proof among its jury instructions. JA 2045-9. Again, the district court did not provide any immediate or contemporaneous curative instruction.

Counsel for the government again made similar statements in rebuttal closing argument by repeatedly suggesting that the defendant had some burden to present evidence or call witnesses:

- "[W]hen defense the defense counsel stands up here and claims there's missing evidence, they haven't shown you any missing evidence." JA 2588.

- "Again, the burden never shifts, but you never saw any evidence whatsoever from the defense that Rick John embezzled or stole any money…. You have not seen any evidence to the contrary." JA 2590.

Following the government's rebuttal, Whyte renewed his motion for mistrial with prejudice noting that the government had engaged yet again in burden shifting before the jury. JA 2594-5. The district court overruled the motion, noting that the prosecution "[g]ot near the edge, but I don't think she went over it." JA 2595. Standing alone, the government's rebuttal argument crossed the line, and placed in context with the plethora of improper statements throughout the trial and closing arguments, it is obvious that Whyte was prejudiced and the jury tainted. The basic

50

burden instruction given did not suffice and Whyte's conviction should be reversed.

## CONCLUSION

This case presents a narrow issue focused on whether the United States should be collaterally estopped from pursuing criminal charges where a civil jury found against a relator and the United States in a relator-assigned *qui tam* action. It is the rare case that a civil *qui tam* action, without government intervention, proceeds to trial before the United States has the opportunity to prosecute the same defendant. It is the rarer case that not only does the relator-led *qui tam* case proceed to trial prior to the criminal action, but that the civil jury also determines that the defendant did not engage in fraud on any of 48 counts alleged. It is the unprecedented case, as is before this Court, that the essential elements of each and every claim alleged by the United States in an indictment require the same fraud to be established beyond a reasonable doubt that the civil jury rejected wholesale.

It was reversible legal error for Whyte to be forced to defend himself a second time and re-litigate the identical allegations rejected by a civil jury under a lesser burden of proof than required in the criminal context. The United States should have been collaterally estopped from proceeding with criminal charges against Whyte and his conviction should not stand. Whyte requests this Court

reverse his conviction because the Indictment and his prosecution were barred by the doctrine of collateral estoppel.

Similarly, the case against Whyte should never have gone to trial, much less have been submitted to the jury, because the Indictment was fatally flawed as a matter of law. The government indicted Whyte on three species of fraud, each of which required the United States or an agency/department thereof to have been the defrauded party. In a pre-trial ruling, the district court held that the JCCI was the United States, a clear and reversible legal error. The district court committed a second reversible error by transforming a question of law into a question of fact for the jury's determination. In so doing, the jury was presented with insufficient evidence to support a finding that the JCCI was the United States. Accordingly, Whyte requests this Court reverse his conviction.

Finally, the prosecution undeniably engaged in misconduct throughout the trial, including making prejudicial comments to the jury about defense counsel and by making arguments that shifted the burden to the defendant in violation of his constitutional rights. Whyte requests this Court reverse his conviction because he was prevented from obtaining a fair trial due to the prejudicial and improper conduct of the government in his case.

52

## REQUEST FOR ORAL ARGUMENT

Whyte respectfully requests oral argument, which would be helpful to the Court because this appeal presents important and unanswered questions regarding the applicability of the common law doctrine of collateral estoppel to the United States as applied in the context of a relator-led *qui tam* False Claims Act action. This appeal also presents important and unanswered questions regarding the role of the multi-national coalitions and frauds pleaded as victimizing the United States. Whyte would welcome an opportunity to address any questions the Court may have.

Respectfully submitted,

WILLIAM R. WHYTE

By:  /s/Justin M. Lugar
    Of Counsel

Justin M. Lugar (VSB No. 77007)
GENTRY LOCKE
P.O. Box 40013
Roanoke, Virginia  24022-0013
(540) 983-9300
Fax: (540) 983-9400
jlugar@gentrylocke.com
monday@gentrylocke.com
*Counsel    for    Defendant–Appellant*
*William R. Whyte*

53

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)(2)(B)(i) AND LOCAL RULE 32(b)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.  This brief complies with the type volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) and Local Rule 32(b) because it contains <u>12,021</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) (i.e., table of contents, table of citations, requests for oral argument, and any certificates of counsel).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced 14-point serifed typeface, Times New Roman, using Microsoft Word 2010.

<u>s/Justin M. Lugar</u>
Justin M. Lugar

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, counsel of record for Appellant, does hereby certify on this 11th day of July, 2018, that the required copies of the foregoing **Opening Brief of Appellant** were filed with the Clerk of the Court electronically using the Court's CM/ECF system which will send notification of such filing to the following CM/ECF participants:

Heather L. Carlton
Office of the U.S. Attorney
255 West Main Street
Suite 130
Charlottesville, VA 22902
(434) 293-4283
Heather.carlton@usdoj.gov

Caitlin R. Cottingham
Jeremy R. Sanders
U.S. Department of Justice
Fraud Division
1400 New York Ave., NW
Washington, DC 20530
(202) 616-5575
(202) 616-2650
Caitlin.cottingham@usdoj.gov
Jeremy.sanders@usdoj.gov

*Counsel for Appellee*

s/Justin M. Lugar
Justin M. Lugar
